UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CRAIG MOWRY,                                          :

              Plaintiff,                :

       -against-                                :

VIACOM INTERNATIONAL, INC. f/k/a               :
PARAMOUNT COMMUNICATIONS, INC.,
SCOTT RUDIN,  SCOTT RUDIN PRODUCTIONS,          :
INC., ANDREW M. NICCOL &  PARAMOUNT
PICTURES CORPORATION,                          :

          Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

               03 Civ. 3090 (AJP)

          **OPINION AND ORDER**

**ANDREW J. PECK, United States Chief Magistrate Judge:**

       Plaintiff Craig Mowry brought this action for copyright infringement under 17 U.S.C.

§ 101, et seq., alleging that defendants' motion picture *The Truman Show* infringed on Mowry's

unpublished screenplay entitled *The Crew*.  (See generally Dkt. No. 18: Am. Compl.)  Presently

before this Court is defendants' motion for summary judgment (Dkt. Nos. 52-57, 60-61, 65-67) and

defendants' motion to exclude the expert report and testimony of plaintiff's expert Dr. Carole E.

Chaski on both Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), and

relevancy grounds (Dkt. Nos. 33, 34 & 43).

       The parties have consented to decision of this case by a Magistrate Judge pursuant

to 28 U.S.C. § 636(c).  (Dkt. No. 27.)

For the reasons set forth below, defendants' motion to exclude Dr. Chaski's testimony to the extent it purports to prove that defendants had access to Mowry's screenplay is GRANTED, and defendants are GRANTED summary judgment because of the lack of proof of access (or striking similarity).

## Background

Plaintiff Craig Mowry is the author and copyright holder of a screenplay titled *The Crew*. (Dkt. No. 18: Compl. ¶¶ 3, 9-19.) Mowry claims that defendants' successful screenplay for the motion picture *The Truman Show* was not an original work of authorship, but was in fact "knowingly and deliberately stolen by defendants from Mowry's copyrighted screenplay, treatment and character profiles for *The Crew*." (Am. Compl. ¶ 9.)

Mowry hired Dr. Chaski as an expert witness under Fed. R. Evid. 702, and intends to use Dr. Chaski's expert linguistic analysis to prove that defendants had access to *The Crew*:

> Dr. Chaski's report is being proffered solely to substantiate plaintiff's contention that defendants must have had access to plaintiff's work, and to explain that in her expert-linguist's opinion, the language and expression used by the defendants exhibit such similitude within certain illustrative properties that is is impossible that *The Truman Show* was created without defendants' having seen, and been influenced by, plaintiff's screenplay. . . . Dr. Chaski's report in no way purports to try to establish actual copyright infringement.

(Dkt. No. 47: Mowry Chaski Opp. Br. at 2; <u>see</u> <u>also</u> Dkt. No. 35: 11/23/04 Conf. Tr. at 8.)

Accordingly, the Court will examine the appropriateness of Dr. Chaski's expert testimony solely on the issue of "access."

# ANALYSIS

## I.   APPLICABLE COPYRIGHT LAW PRINCIPLES[1/]

### A.   Proving "Actual Copying"

It is well-settled copyright law that in order to establish copyright infringement, "a plaintiff must show that: (1) the defendant actually copied the plaintiff's work; and (2) the copying is illegal because a 'substantial similarity' exists between the defendant's work and the protectible elements of the plaintiff's work." Street Wise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 747 (2d Cir. 1998); accord, e.g., Pem-America, Inc. v. Sunham Home Fashions, LLC, No. 03-7707, 83 Fed. Appx. 369, 371, 2003 WL 22964908 at *2 (2d Cir. Dec. 12, 2003); Boisson v. Banian, Ltd., 273 F.3d 262, 267-68 (2d Cir. 2001); Yurman Design, Inc. v. PAJ, Inc., 262 F. 3d 101, 110 (2d Cir. 2001); Hamil America, Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999), cert. denied, 528 U.S. 1160, 120 S. Ct. 1171 (2000); Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998); Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996, 1002 (2d Cir. 1995); Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 122-23 (2d Cir. 1994); Laureyssens v. Idea Group, Inc., 964 F.2d 131, 149-40 (2d Cir. 1992).[2/]

---

[1/]   The summary judgment standard is well known and will not be set out in full herein.  See, e.g., Fed. R. Civ. P. 56; Island Software & Computer Serv., Inc. v. Microsoft Corp., No. 04-0744, __ F.3d __, 2005 WL 1514234 at *2 (2d Cir. June 28, 2005); Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50-51 (2d Cir. 2003); Mannion v. Coors Brewing Co., 04 Civ. 1187, __ F. Supp. 2d __, 2005 WL 1705194 at *2 (S.D.N.Y. July 21, 2005); Ferrer v. Potter, 03 Civ. 9113, 2005 WL 1022439 at *2-4 (S.D.N.Y. May 3, 2005) (Peck, M.J.); Cox v. Abrams, 93 Civ. 6899, 1997 WL 251532 at *2 (S.D.N.Y. May 14, 1997).

[2/]   See also 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B] (2005 ed.) ("[C]opying as a factual matter is insufficient, if improper appropriation is lacking.
(continued...)

"'Actual copying may be established by direct or indirect evidence.'" <u>Jorgensen</u> v. <u>Epic/Sony Records</u>, 351 F.3d 46, 51 (2d Cir. 2003) (quoting <u>Boisson</u> v. <u>Banian, Ltd.</u>, 273 F.3d at 267). "Indirect evidence may include proof of 'access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.'" <u>Boisson</u> v. <u>Banian, Ltd.</u>, 273 F.3d at 267; <u>accord, e.g.</u>, <u>Hamil America, Inc.</u> v. <u>GFI</u>, 193 F.3d at 99; <u>Castle Rock Entm't, Inc.</u> v. <u>Carol Publ'g Group, Inc.</u>, 150 F.3d at 137; <u>Repp</u> v. <u>Webber</u>, 132 F.3d 882, 889 (2d Cir. 1997), <u>cert. denied</u>, 525 U.S. 815, 119 S. Ct. 52 (1998); <u>Fisher-Price, Inc.</u> v. <u>Well-Made Toy Mfg. Corp.</u>, 25 F.3d at 123; <u>Laureyssens</u> v. <u>Idea Group, Inc.</u>, 964 F.2d at 140.

"[C]opying is often proven through circumstantial evidence consisting of (1) access by the defendant to the plaintiff's work, <u>and</u> (2) probative similarity between the two works." <u>Tienshen, Inc.</u> v. <u>C.C.A. Int'l (N.J.), Inc.</u>, 895 F. Supp. 651, 656 (S.D.N.Y. Aug. 18, 1995) (emphasis added); <u>see also, e.g.</u>, <u>Jorgensen</u> v. <u>Epic/Sony Records</u>, 351 F.3d at 51 ("Because direct evidence of copying is seldom available, a plaintiff may establish copying circumstantially 'by demonstrating that the person who composed the defendant's work had access to the copyrighted material,' . . . and that there are similarities between the two works that are 'probative of copying.'") (quoting <u>Herzog</u> v. <u>Castle Rock Entm't</u>, 193 F.3d 1241, 1249 (11th Cir.1999), & <u>Repp</u> v. <u>Webber</u>, 132 F.3d at 889);

---

[2]/    (...continued)
Conversely, even when two works are substantially similar with respect to protectible expression, if the defendant did not copy as a factual matter, but instead independently created the work at issue, then infringement liability must be denied. Legions of cases promulgate the twin requirements of access plus substantial similarity . . .") (fn. omitted); 1 William F. Patry, <u>Copyright Law & Practice</u> at 691 (1994) ("Even if the defendant had access to the plaintiff's work before completing the allegedly infringing work, no liability arises unless the defendant actually copied from the plaintiff. Access is thus not the same as, nor a substitute for proof of, copying") (fn. omitted).

Street Wise Maps, Inc. v. Vandam, Inc., 159 F.3d at 747; Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d at 137; Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992) ("It is now an axiom of copyright law that actionable copying can be inferred from the defendant's access to the copyrighted work and substantial similarity between the copyrighted work and the alleged infringement."); Silberstein v. Fox Entm't Group, Inc., 02 Civ. 1131, 2004 WL 1620895 at *5 (S.D.N.Y. Jul. 19, 2004); Cox v. Abrams, 93 Civ. 6899, 1997 WL 251532 at *3 (S.D.N.Y. May 14, 1997); see 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[B] ("[I]n order to demonstrate defendant's copying as a factual matter, plaintiff must prove the twin ingredients of probative similarity plus access.") (fn. omitted); 1 William F. Patry, Copyright Law & Practice at 694-95 ("Proof of the defendant's access to the plaintiff's work is an indispensable element of the prima facie case . . .").

"'[P]robative,' rather than 'substantial' similarity is the correct term in referring to the plaintiff's initial burden of proving actual copying by indirect evidence." Castle Rock Entm't., Inc. v. Carol Publ'g Group, Inc., 150 F.3d at 137; see also, e.g., Repp v. Webber, 132 F.3d at 889 n.1; Laureyssens v. Idea Group, Inc., 964 F.2d at 140; Hoban v. DC Comics, 48 F. Supp. 2d 298, 308 (S.D.N.Y. 1999) ("The level of similarity needed to establish copying is now commonly referred to as 'probative similarity.'"); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.01[B] ("Professor Latman wisely counsels that, in the previous formulation, the term 'substantial similarity' be discarded in favor of 'probative similarity.' In other words, when the question is copying as a factual matter, then similarities that, in the normal course of events, would

not be expected to arise independently in the two works are probative of defendant's having copied as a factual matter from plaintiff's work.") (fns. omitted).

Only after actual copying is established can a plaintiff move on to demonstrate that the copying was improper or unlawful by showing a "substantial similarity" between the works. E.g., Castle Rock Entm't., Inc. v. Carol Publ'g Group, Inc., 150 F.3d at 137; see also, e.g., Repp v. Webber, 132 F.3d at 889; Silberstein v. Fox Entm't Group, Inc., 2004 WL 1620895 at *5.[3/]

**B.     Proving "Access"**

"Access means that an alleged infringer had a 'reasonable possibility' – not simply a 'bare possibility' – of hearing [or seeing] the prior work; access cannot be based on mere 'speculation or conjecture.'" Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (quoting Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir.1988)); see also, e.g., Silberstein v. Fox Entm't Group, Inc., 02 Civ. 1131, 2004 WL 1620895 at *5 (S.D.N.Y. Jul. 19, 2004) ("'Access' means that the alleged infringer had a reasonable opportunity to observe or copy plaintiff's work.")  (citing Tisi v. Patrick, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000)); Cox v. Abrams, 93 Civ. 6899, 1997 WL 251532 at *3 (S.D.N.Y. May 14, 1997); Intersong-USA v. CBS, Inc., 757 F. Supp. 274, 281 (S.D.N.Y. 1991) ("Access is hearing [or seeing] or having a reasonable opportunity to hear [or see] the plaintiff's work, in other words having the opportunity to copy.") To support a claim of access, a plaintiff must offer "'significant, affirmative and probative evidence,'" not conjecture or speculation. Jorgensen v. Epic/Sony Records, 351 F.3d at 51; accord, e.g., Silberstein v. Fox Entm't Group, Inc., 2004 WL

---

[3/]     Defendants also moved for summary judgment on the second prong, that there is no "substantial similarity" between the works' protectible elements. (E.g., Dkt. No. 53: Defs. S.J. Br. at 13-24.)  The Court need not reach that issue.

1620895 at *5; <u>Tisi</u> v. <u>Patrick</u>, 97 F. Supp. 2d at 547 ("Conjecture or speculation is insufficient.");

<u>accord</u>, <u>e.g.</u>, <u>Cox</u> v. <u>Abrams</u>, 1997 WL 251532 at *3 ("'Mere conjecture and hypotheses will not

suffice to establish access.'"); <u>Intersong-USA</u> v. <u>CBS, Inc.</u>, 757 F. Supp. at 281 ("A plaintiff must

offer significant, affirmative and probative evidence to support a claim of access. . . . Conjecture or

speculation of access will not suffice."); <u>Tomasini</u> v. <u>Walt Disney Co.</u>, 84 F. Supp. 516, 519, 522

(S.D.N.Y. 2000); 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 13.02[A] (2005

ed.) ("Access may not be inferred through mere speculation or conjecture.  There must be a

reasonable possibility of viewing plaintiff's work -- not a bare possibility. . . .  [T]he mere fact that

plaintiff's manuscript was physically in the same city in which the defendant resided did not give the

defendant an opportunity to view the manuscript so as to constitute access, notwithstanding the bare

physical possibility of such a view.") (fns. omitted);1 William F. Patry, <u>Copyright Law & Practice</u>

at 698-700 (1994) ("[T]he courts have cautioned that although circumstantial evidence is sufficient

to establish access, a defendant's opportunity to view the copyrighted work must exist by a

reasonable possibility – not a bare possibility or by speculation, conjecture and suspicion.  Thus,

attempts to establish an inference of access through intermediaries such as literary agents . . . while

theoretically possible, are seldom successful in practice.  What must be established in each case is

probative evidence that the individual(s) who actually created the allegedly infringing work had a

reasonable opportunity to see, hear, or read the plaintiff's work") (fns. omitted).

"'If the infringed work has not been widely disseminated, a party can prove access by

showing a particular chain of events or link by which the alleged infringer might have gained access

to the work.'"  <u>Krasselt</u> v. <u>Seagram & Sons, Inc.</u>, 01 Civ. 2821, 2002 WL 1997926 at *3 (S.D.N.Y.

Aug. 29, 2002) (quoting <u>Cox</u> v. <u>Abrams</u>, 1997 WL 251532 at *3); <u>accord</u>, <u>e.g.</u>, <u>Tomasini</u> v. <u>Walt Disney Co.</u>, 84 F. Supp. 2d at 519 ("'As proof of access, a plaintiff may show that "(1) the infringed work has been widely disseminated or (2) a particular chain of events exists by which the defendant might have gained access to the work."'") (quoting <u>Tuff 'N' Rumble Mgmt., Inc.</u> v. <u>Profile Records, Inc.</u>, 95 Civ. 0246, 1997 WL 158364 at *4 (S.D.N.Y. Apr. 2, 1997)); <u>Santrayll</u> v. <u>Burrell</u>, 91 Civ. 3166, 1998 WL 60924 at *2 (S.D.N.Y. Jan. 21, 1998); <u>Sylvestre</u> v. <u>Oswald</u>, 91 Civ. 5060, 1993 WL 179101 at *3 (S.D.N.Y. May 18, 1993).[4]

Here, it is undisputed that Mowry's screenplay for *The Crew* was not widely disseminated – in fact it was unpublished. (<u>See</u> Dkt. No. 69: Mowry S.J. Opp. Aff. ¶¶ 18-22; Dkt. No. 76: Mowry S.J. Opp. Br. at 6-7.) The Court turns to the issue of whether Mowry showed that defendants had a reasonable opportunity to read his unpublished work.

## II. MOWRY HAS FAILED TO SHOW THAT DEFENDANTS HAD "ACCESS" TO *THE CREW*

Mowry's summary judgment opposition brief asserts that defendants had "access" to Mowry's *The Crew* because he circulated it to various individuals in the entertainment and advertising industry:

> In the later half of the 1980's, dozens of copies of *The Crew* (accompanied by its treatment and character profiles) were circulated by Mowry and others to various

---

[4] <u>See also</u> 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 13.02[A] ("Even if no particular channel of communication is established, whereby given individuals may have communicated to the defendant the contents of plaintiff's work, access may still be found, if plaintiff's work has been widely disseminated, as by extensive publication."); 1 William F. Patry, <u>Copyright Law & Practice</u> at 698-700 (quoted above).

film industry contacts and studios. Those who read, received and/or circulated Mr. Mowry's work included, but are not limited to, Jim DeWoody and his ex-wife Beth Rudin – each of whom had longstanding film industry relationships – Mike Nathanson, Gil Wishnick, Kenyon Kramer, Katherine Rudin,[5] Greg Hamburger, Stacey Keach, Nancy Jacobs, Cliff Jar, Bob Smith, Andrew Kay, Henry Kurlya, Steve Dupont, Bill Swanson, Ridley Scott (a film director), Jeff Berg (an agent), Leslie Podkin, Mort Salowitz, Todd Shiftman, Bill Temko and various agents including, but not limited to, the agent for John Cassavettes.

The individuals listed above all had direct or indirect contacts in or to the entertainment, advertising and/or movie industry. For example, . . . Steve Dupont and Henry Kurlya, had connections in and to the advertising industry (where Mr. Niccol was then working as a director of commercials coincidentally at the same time he says he conceived of *The Truman Show* idea). . . . Mowry further mailed multiple unsolicited copies of the 1988 draft in late 1988 and early 1989, by regular mail, in an attempt to secure industry interest in the script.

(Dkt. No. 76: Mowry S.J. Opp. Br. at 6-7, record citations omitted; see also Dkt. No. 61: DeNeve Aff. Ex. 8: Mowry Dep. at 71-113.)[6]

Mowry's circulation of his unpublished manuscript of *The Crew* is not a "wide dissemination" where access can be implied.[7] Mowry therefore must show "a particular chain of

---

[5]     Katherine Rudin is not related to defendant Scott Rudin. (See Dkt. No. 55: Scott Rudin Reply Aff. ¶ 2).

[6]     It is not clear that the version of *The Crew* that Mowry circulated is the one that he filed with the Copyright Office. (See Mowry Dep. at 67-72, 83-84, 170-71.)

[7]     "This court has consistently recognized widespread dissemination giving rise to an inference of access exclusively in cases where the allegedly infringed work has had considerable commercial success or is readily available on the market." Silberstein v. Fox Entm't Group, Inc., 2004 WL 1620895 at *7; see, e.g., Nicholls v. Tufenkian Import/Export Ventures, Inc., 04 Civ. 2110, 2005 WL 589412 at *5 (S.D.N.Y. Mar. 11, 2005) ("While Mr. Nicholls also disseminated images of the Prado directly to his customer base, there is no evidence that any of the recipients shared the advertisements with the defendants."); compare, e.g., ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 997-98 (2d Cir.1983) (plaintiff's infringed song was widely disseminated and was number one on the popular music charts
(continued...)

events or 'link' by which [defendants] might have gained access to the work." <u>Sylvestre</u> v. <u>Oswald</u>, 91 Civ. 5060, 1993 WL 179101 at *3 (S.D.N.Y. May 18, 1993); <u>see also</u>, <u>e.g.</u>, <u>Tomasini</u> v. <u>Walt Disney Co.</u>, 84 F. Supp. 2d 516, 522 (S.D.N.Y. 2000) ("[A]n inference of access based on a third party's possession of the plaintiff's work requires more than a mere allegation that someone known to the defendant possessed the work in question.") (quotations omitted).

The essence of Mowry's claim is that since he sent copies of *The Crew* to people in the "entertainment" or "advertising" industries, he has shown that there is a reasonable possibility that defendant Andrew Niccol (or the other defendants) had access to *The Crew*. The evidence, however, is merely that certain people received *The Crew* from Mowry; Mowry has not presented any evidence that these recipients, who do not work for defendants, passed *The Crew* on directly or indirectly to any of the defendants. The needed "particular chain or link" thus is absent. For example, James DeWoody's affidavit states:

> 2. In the late 1980s, Craig Mowry gave me a copy of the screenplay of The Crew for my review. I specifically recall receiving and reading the screenplay and discussing the screenplay with Mr. Mowry.
>
> 3. After reading the screenplay and discussing it with Mr. Mowry, I forwarded a copy of the screenplay to a number of individuals who I thought would be interested in the work. Two of the individuals to whom I specifically recall sending

---

2/ (...continued)
for weeks in the United States and England); <u>Acuff-Rose Music, Inc</u>. v. <u>Jostens, Inc.</u>, 988 F. Supp. 289, 293 (S.D.N.Y.1997) ("The Tippin song's widespread dissemination and popularity, evidenced by its top five ranking as a country hit at the time Jostens conceived and approved its ad campaign, demonstrates that defendant had ample opportunity to see or hear the Tippin lyrics.").

a copy of the work include Mike Nathanson of Columbia Pictures and Catherine Rudin (who both acknowledged its receipt after I sent it to them).

(Dkt. No. 69: DeWoody Aff. ¶¶ 2-3.)[8]

Ms. Rudin, to whom DeWoody refers, similarly acknowledges receipt of *The Crew* but does not state that she gave it to anyone else:

> 2.  In the late 1980s, Craig Mowry gave me a copy of a screenplay he had written at that time for my review. At that time I was a screenwriter.
>
> 3.  I specifically recall receiving and reading the screenplay and discussing the screenplay with its author Mr. Mowry.

(Dkt. No. 69: Katherine Rudin Aff. ¶¶ 2-3.)[9] Mowry admitted that he did not know if Ms. Rudin sent the script to anyone. (Mowry Dep. at 98.)

Similarly, Gil-Adrienne Wishnick merely stated that she "confirm[ed] that [she] received a copy of your script, 'The Crew,' while [she] was a story editor at The Samuel Goldwyn Company." (Dkt. No. 69: Wishnick "Aff.") Neither Wishnick nor Mowry explain why Wishnick would pass the script on to Viacom/Paramount, a competitor of Samuel Goldwyn Company. Indeed, at his deposition, Mowry admitted that he had no reason to believe that Wishnick gave *The Crew* to anyone else. (Dkt. No. 61: DeNeve Aff. Ex. 8: Mowry Dep. at 82.)

---

[8]  Mowry testified at his deposition that he "believe[d] Mr. DeWoody was acquainted with Mr. Rudin," but he has no "specific knowledge" that DeWoody sent Mr. Rudin a copy of *The Crew*. (Mowry Dep. at 121-22.) While Mowry added that "[i]t's possible" DeWoody did so (id.), such speculation is not enough (see cases cited above) – particularly when DeWoody's affidavit did not say that he did so.

[9]  As noted above, Katherine Rudin is not related to defendant Scott Rudin. (See page 9 n.5 above.)

Steven DuPont's affidavit stated that "[i]n the late 1980s, while I was working in the advertising industry for Lowe & Partners of New York, Craig Mowry gave me a copy of the screenplay of The Crew for my review."  (Dkt. No. 69: DuPont Aff. ¶ 2.)  Mowry admitted that he has no reason to believe DuPont gave the script to anyone else.  (Mowry Dep. at 101.)

Andrew Kay, a "freelance writer" who in the 1980s "was involved in the entertainment industry as a celebrity interviewer," stated that he received *The Crew* from Mowry in the late 1980s and "forwarded a copy of the screenplay [to] Henry Kuryla for his review."  (Dkt. No. 69: Kay Aff. ¶¶ 2-4.)[10/]  To close the loop, Henry Kuryla, who was then "employed in the advertising industry as a television commercial director," stated that he received *The Crew* from Kay, read it and discussed it with Mowry.  (Dkt. No. 69: Kuryla Aff. ¶¶ 2-3.)

Although Mowry's own affidavit states that he gave copies of *The Crew* to others in the "film industry" in the late 1980s (Dkt. No. 69: Mowry S.J. Opp. Aff. ¶¶ 19-22), there is no indication that any of those recipients worked for or had any connection to defendants Andrew Niccol, Scott Rudin (or his company), or Viacom/Paramount.  See, e.g., Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51-52 (2d Cir. 2003) ("Jorgensen argues, first, that his act of mailing unsolicited tapes of 'Lover' to scores of record and music publishing companies, including the

---

[10/]     The Kay and DeWoody affidavits show that Mowry's counsel, who prepared these affidavits, tried to find out and document the further distribution, if any, of *The Crew* by the people to whom Mowry gave copies.  The inference, therefore, is that the other affiants besides Kay and DeWoody did not pass *The Crew* on to anyone else.  Certainly, there is no evidence that they passed it on to anyone else, let alone any evidence that they passed it on to any defendant.

corporate defendants, constituted access because the corporate employees who allegedly received the mailing could have provided the [defendant] songwriters with a copy of 'Lover.' . . . however, Jorgensen has not provided <u>any</u> reasonable documentation that he actually mailed such tapes (or when or to whom these tapes were purportedly sent). Jorgensen's mass-mailing allegation was, thus, properly rejected by the District Court as legally insufficient proof of access.") (citing cases).

Mowry expresses amazement that defendants did not depose any of the individuals he named as having received *The Crew*. (Dkt. No. 76: Mowry S.J. Opp. Br. at 17 n.3; Dkt. No. 77: Mowry 56.1 Response ¶ 28.) The burden of proving access, however, lies squarely on the plaintiff's – here, Mowry's – shoulders. <u>See</u>, <u>e.g.</u>, <u>Tisi</u> v. <u>Patrick</u>, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000) ("The plaintiff has the burden of presenting 'significant, affirmative and probative' evidence to support a claim of access. Conjecture or speculation is insufficient.") (citations omitted); <u>see also</u>, <u>e.g.</u>, <u>Silberstein</u> v. <u>Fox Entm't Group, Inc.</u>, 02 Civ. 1131, 2004 WL 1620895 at *5-6 (S.D.N.Y. July 19, 2004); <u>Cox</u> v. <u>Abrams</u>, 93 Civ. 6899, 1997 WL 251532 at *3-4 (S.D.N.Y. May 14, 1997); 1 William F. Patry, <u>Copyright Law & Practice</u> at 695 (1994) ("The burden of proving access is on the plaintiff."). As discussed in Point I.B above, access requires a "reasonable possibility," shown by "significant, affirmative and probative evidence," and neither a "bare possibility" nor "conjecture or speculation" will suffice. <u>See</u> cases & treatises cited in Point I.B above. Mowry does not meet his burden.

A minority of cases apply a "'corporate receipt' theory," under which, "once plaintiff establishes that a corporation received its work, 'the burden of going forward with the evidence [as

to access] shifts to defendants, though the burden of proof remains upon plaintiff.'" See 1 William F. Patry, Copyright Law & Practice at 699 & n. 802 (citing cases accepting and rejecting the corporate receipt theory) (1994). Here, even if the Court were to recognize the corporate receipt theory, it would be of no benefit to Mowry, because he has not produced any evidence that anyone at Paramount, Viacom or Rudin Productions received *The Crew* from any source (much less that *The Crew* then was made available to those who actually created *The Truman Show*).

Mowry's access claim is based on the theory that his sending *The Crew* to a few dozen named and unnamed people in the "entertainment" and "advertising" industries, without any link in the chain to show that those recipients had any connection to Andrew Niccol, Scott Rudin (or his company) or Viacom/Paramount, is sufficient to get to the jury on the question of access. That is not the law.[11] At a bare minimum, Mowry needed to show that someone to whom he gave *The Crew* was connected to a defendant. Mowry has not done so, and thus his attempts at establishing a chain of access fails. See, e.g., Gaste v. Kaiserman, 863 F.2d 1061, 1067 (2d Cir.1988) ("Access through

_____

[11]     Nor should it be. Many successful movies are sued by the author of an unpublished novel or screenplay who claims that the movie was based on and infringed his work. Indeed, *The Truman Show* has been sued not only by plaintiff Mowry but also by a Mr. Dunn, the author of a play called *Frank's Café*, which also uses the device of hidden cameras. (See Dkt. No. 61: DeNeve Aff. Ex. 8: Mowry Dep. at 45-47, 132-35.) The "entertainment industry" is a broad and amorphous term. Mowry testified that he gave a copy of *The Crew* to two California "realtor[s] who knew many, many people in California, in Los Angeles." (Mowry Dep. at 92, 93.) Mowry's definition of entertainment industry seems to include everyone in Los Angeles who may "know" people in the industry (including, perhaps, all the unemployed actors and actresses who wait tables or park cars while waiting for their break). Greater proof of access should be, and is, required.

third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work.").

Mowry's "industry" access theory has been rejected by the courts in this District and elsewhere in prior cases. For example, in <u>Silberstein</u> v. <u>Fox Entm't Group, Inc.</u>, 02 Civ. 1131, 2004 WL 1620895 (S.D.N.Y. July 19, 2004), plaintiff claimed that the defendants' animated movie *Ice Age* infringed his copyright in his cartoon drawing of a squirrel-rat called *Sqrat*. <u>Id.</u>, 2004 WL 1620895 at *1-2. In granting summary judgment to defendants, Judge Holwell rejected plaintiff's entertainment industry access theory:

> Silberstein further supports her access argument by enumerating the entertainment industry professionals to whom she pitched Sqrat, and the media mentions of Sqrat . . . . Silberstein does not offer evidence that anyone in the industry to whom she pitched Sqrat ever communicated about Sqrat to anyone involved in he creation of *Ice Age*, does not produce evidence that anyone involved in *Ice Age* ever saw or heard about any media mentions of Sqrat, and does not provide any other indication of a nexus between receivers of information about Sqrat and the *Ice Age* creators.

<u>Id.</u>, 2004 WL 1620895 at *6. Here, as in <u>Silberstein</u>, Mowry has no evidence that any of the people he gave *The Crew* to passed it on, directly or indirectly, to Niccol, Rudin or Viacom/Paramount.

Judge Ward granted summary judgment on access grounds to defendants in <u>Cox</u> v. <u>Abrams</u>, 93 Civ. 6899, 1997 WL 251532 (S.D.N.Y. May 14, 1997). Plaintiff Cox conceded that she did not provide her work directly to defendants, but claimed that she submitted it to book publisher Harcourt, which, plaintiff claimed, could have made it available to defendants (despite defendants' denials). <u>Id.</u>, 1997 WL 251532 at *4. Judge Ward granted summary judgment for defendants, explaining:

The sworn testimony of all those whom plaintiffs assert were involved in the alleged infringement of Ms. Cox's manuscript thus controverts plaintiffs' theory of access. Consequently, in order to accept that theory, this Court would have to assume (1) that Harcourt, despite rejecting the manuscript of "Breaking the Tape," made and kept a copy of it and provided it or communicated its substance to one of the defendants; (2) that Harcourt editors and other Harcourt employees lied when they swore under oath that they did not provide the manuscript or communicate its substance to any of the defendants; and (3) that defendants lied when they swore under oath that they had never heard of the Coxes or of the manuscript before this litigation.

Plaintiffs, however, have been unable to set forth any evidence supporting these assumptions. Under these circumstances, plaintiffs have failed to meet their burden of establishing a reasonable probability of access.

Id., 1997 WL 251532 at *4 (citing cases); see also, e.g., Jorgensen v. Epic/Sony Records, 351 F.3d at 51-52 (Plaintiff's "act of mailing unsolicited tapes of 'Lover' to scores of record and music publishing companies, . . . was . . . properly rejected by the District Court as legally insufficient proof of access."); Herzog v. Castle Rock Entm't,193 F.3d 1241, 1249-50 (11th Cir. 1999) (affirms summary judgment for defendants, rejecting plaintiff's access theory that she gave her work to a Mr. Cosford, who attended the 1993 Miami Film Festival also attended by defendant John Sayles, the author of the allegedly infringing screenplay, and that Cosford "could have given Mr. Sayles access" to plaintiff's work. "The mere fact that [plaintiff's] screenplay was physically in the same city in which Mr. Sayles visited did not give him an opportunity to view the manuscript so as to constitute access."); Ferguson v. National Broad. Co., 584 F.2d 111, 113 (5th Cir. 1978) (No individual that received plaintiffs' work was sufficiently connected to defendant to be deemed an "intermediary," and the Court upheld summary judgment for defendants, explaining that "[t]o find that [defendant composer] Williams had access, we would have to assume that (1) although BMI

professed no interest in plaintiff's composition and returned the original to her, it made and kept a copy which it later allowed Williams to see, and (2) Williams was lying when he said he had never heard of the plaintiff's composition. Plaintiff has given us no reason to believe that either of these assumptions is true, and certainly they are not obviously compelling. Thus, a finding of access in this case would be based on speculation or conjecture, and this is impermissible."); Tomasini v. Walt Disney Co., 84 F. Supp. 2d 516, 522 (S.D.N.Y. 2000) ("Tomasini has failed to proffer 'significant, affirmative and probative evidence' establishing a reasonable possibility of access, but instead has relied on the unsubstantiated speculation that Pellegrino maintained his former contacts with Disney personnel and used those contacts to market Tomasini's Gargoyles Property to Disney. Indeed, plaintiff largely concedes his lack of evidence to support his allegations." Summary judgment granted for defendant on lack of access.) (citation omitted); Polsby v. St. Martin's Press, Inc., 97 Civ. 790, 1999 WL 225536 at *3 (S.D.N.Y. Apr. 19, 1999) (granting summary judgment for defendants on lack of access:  "Plaintiff's allegations fail to establish a connection, either direct or indirect, between any of the defendants and plaintiff's writings.  Plaintiff does not allege that she sent her work directly to defendants, or that she made it available to anyone even remotely connected with defendants.  Instead, plaintiff rests almost exclusively on the naked claim that she disseminated her work to 'numerous persons' in and around Washington, D.C. in the years prior to publication of 'My Soul to Take.'  This allegation without more, however, is insufficient as a matter of law to raise an

inference of defendants' access to plaintiff's work."), aff'd, No. 00-7501, 8 Fed. Appx. 90 (2d Cir. May 8, 2004).[12]

Defendants have sworn that prior to this litigation, they never heard of either Craig Mowry or *The Crew* nor read *The Crew*. (Dkt. No. 55: Rudin Aff. ¶¶ 1-3; Dkt. No. 60: Niccol Aff. ¶ 16.). Despite all the affidavit testimony of people Mowry gave his draft to, Mowry admitted in his deposition that other than the proof of access he is attempting to show through Dr. Chaski's report, he has no evidence of access. (See Dkt. No. 61: DeNeve Aff. Ex. 8: Mowry Dep. at 128.) Specifically, Mowry testified:

---

[12]    As noted above (see pages 13-14 above), since most courts (including the Second Circuit) find that "bare corporate receipt" is insufficient to show access, since Mowry has not shown that the corporate defendants received *The Crew*, his "industry" access claim is even more remote and is not sufficient to show access. See, e.g., Jorgensen v. Epic/Sony Records, 351 F.3d at 53 ("Bare corporate receipt of Jorgensen's work, without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access."); Silberstein v. Fox Entm't Group, Inc., 2004 WL 1620895 at *6 ("Looking at the evidence in the light most favorable to plaintiff, it can be inferred that Lipsky spoke to Silberstein and perhaps even received promotional materials about Sqrat. Such an interaction would constitute 'bare corporate receipt' of plaintiff's work by an individual with no alleged connection with anyone involved in the creation of the Ice Age Scrat, which is insufficient to show access."); Jorgensen v. Careers BMG Music Publ'g, 01 Civ. 0357, 2002 WL 1492123 at *4 (S.D.N.Y. July 1, 2002) ('Bare corporate receipt' is insufficient to establish access."); Dimmie v. Carey, 88 F. Supp. 2d 142, 147 (S.D.N.Y. 2000) ("Plaintiff claims that Columbia Records (initially) received the tape and then must have passed it on to Defendants Mattola, Carey and Afanasieff before Hero was created. There is not a scintilla of evidence that this occurred. . . . Plaintiff's theory of access appears to be based on the notion of 'bare corporate receipt'. . . . On the facts presented here, plaintiff's 'best case' scenario of (alleged) unsolicited mailing does not establish 'access.' It would be an unfair and legally impermissible 'stretch' to conclude, as Plaintiff does, that 'by Ms. Dimmie mailing her song to Columbia, Defendants Carey and Afanasieff "had a reasonable opportunity to view or read Plaintiff's work" and therefore had access'. . . . Mailing cannot, on these facts, be equated with access.").

Q.     Other than the similarities between the works, do you have any evidence whatsoever that Mr. Rudin or Mr. Niccol or anyone else at [P]aramount or anyone else connected with *The Truman Show* had access to your work *The Crew*?

A.     No.

(Mowry Dep. at 128.)   Mowry's attempt to prove access through the "industry" theory in his summary judgment papers is not legally sufficient.  <u>See</u>, <u>e.g.</u>, <u>Cox</u> v. <u>Abrams</u>, 1997 WL 251532 at *3-4, & other cases cited earlier in this section.  Unless Mowry can show "striking similarity" between *The Crew* and *The Truman Show*, defendants will be entitled to summary judgment based on lack of access; the Court addresses the striking similarity issue in the next section.

**III.     *THE TRUMAN* SHOW IS NOT "STRIKINGLY SIMILAR" TO *THE CREW*;
        DR. CHASKI'S EXPERT TESTIMONY DOES NOT CHANGE THE RESULT**

        Because Mowry's "industry access" theory is insufficient to demonstrate access (<u>see</u> Point II above), defendants are entitled to summary judgment unless access can be inferred from "striking similarities" between *The Crew* and *The Truman Show*.

        The Second Circuit has "held that where there are striking similarities probative of copying, proof of access may be inferred:  'If the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.'"  <u>Repp</u> v. <u>Webber</u>, 132 F.3d 882, 889 (2d Cir. 1997); <u>accord</u>, <u>e.g.</u>, <u>Seals-McClellan</u> v. <u>Dreamworks, Inc.</u>, No. 03-55570, 120 Fed. Appx. 3, 4 (9th Cir. Dec. 9, 2004) ("Where a plaintiff cannot show a reasonable opportunity for access, proof that the protected and accused works are 'strikingly similar' gives rise to an inference of copying.  To show a striking similarity between works, a plaintiff must

produce evidence that the accused work could not possibly have been the result of independent creation.") (citations omitted); Jorgensen v. Epic/Sony Records, 351 F.3d 46, 56 (2d Cir. 2003) ("We have held that where the works in question are 'so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access.' Jorgensen offered nothing to support this allegation of a striking similarity, however, and as the District Court properly concluded, Jorgensen's own statements – e.g., that the infringement of his song, Lover, was 'subtle' – wholly undercut his claim of a 'striking' similarity between the songs.") (citations & fn. omitted); Gaste v. Kaiseman, 863 F.2d 1061, 1068 (2d Cir. 1988) ("Though striking similarity alone can raise an inference of copying, that inference must be reasonable in light of all the evidence. A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation."); Ferguson v. National Broad. Co., 584 F.2d 111, 113 (5th Cir. 1978) ("Even without proof of access, plaintiff could still make out her case if she showed that the two works were not just substantially similar, but were so strikingly similar as to preclude the possibility of independent creation."); Arnstein v. Porter, 154 F.2d 464, 468-69 (2d Cir. 1946) (leading case on strikingly similar; "In some cases, the similarities between [the two works] are so extensive and striking as, without more, both to justify an inference of copying and to prove improper appropriation.").[13/]

---

[13/]    See, e.g., Moyna LLC v. Victoria's Secret Direct N.Y., LLC, 01 Civ. 9625, 2003 WL 21983032 at *5 (S.D.N.Y. Aug. 19, 2003); Jorgensen v. Careers BMG Music Publ'g, 01 Civ. 0357, 2002 WL 1492123 at *5 (S.D.N.Y. July 11, 2002) ("'Striking similarity exists when two works are so nearly alike that the only reasonable explanation for such a great degree of
(continued...)

"[S]imilarity may be regarded as 'striking' even if somewhat less than verbatim." 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 13.02[B]. "Common errors at times may supply the requisite proof, if sufficiently distinctive." <u>Id</u>.[14] "In all cases, the task is to apply logic and experience to determine if copying is the only realistic basis for the similarities at hand. . . . The better view . . . would seem to be that while expert testimony may be necessary to establish striking similarity in 'technical' areas, such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance." <u>Id</u>. (fns. omitted). Put slightly differently, "[s]imilarity is determined if an ordinary person could aesthetically recognize the copy as the appropriated work." <u>Moyna LLC</u> v. <u>Victoria's Secret Direct N.Y., LLC</u>, 2003 WL 21983032 at *5; <u>see also</u>, <u>e.g.</u>, <u>American Direct Mktg., Inc</u>. v. <u>Azad Int'l, Inc</u>., 783 F. Supp. 84, 95 (E.D.N.Y. 1992) ("Striking similarity exists when two works are 'so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later . . . was copied from the first.' . . . The issue of copying, therefore, rests on the similarities which are judged according to the perception of an 'ordinary observer' or an 'average lay observer.'") (citation omitted); <u>Russ Berrie & Co.</u> v. <u>Jerry</u>

---

[13] (...continued)
similarity is that the later . . . was copied from the first.'") (quoting <u>Cox</u> v. <u>Abrams</u>, 93 Civ. 6899, 1997 WL 251532 at *5 (S.D.N.Y. May 14, 1997)); <u>Tisi</u> v. <u>Patrick</u>, 97 F. Supp. 2d 539, 548 (S.D.N.Y. 2000) (striking similarity test is "stringent"); <u>Dan River, Inc.</u> v. <u>Sanders Sale Enters., Inc.</u>, 97 F. Supp. 2d 426, 429-30 (S.D.N.Y. 2000); <u>Dimmie</u> v. <u>Carey</u>, 88 F. Supp. 2d 142, 149 (S.D.N.Y. 2000); <u>see generally</u>, 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 13.02[B] (2005 ed.).

[14] This is why map makers place fictitious locations on their maps, so-called "copyright traps," so as to prove copying. <u>See</u>, <u>e.g.</u>, <u>Bucklew</u> v. <u>Hawkins, Ash, Baptie & Co.</u>, 329 F.3d 923, 926 (7th Cir. 2003); 1 William F. Patry, <u>Copyright Law & Practice</u> 692 (1994).

Elsner Co.., 482 F. Supp. 980, 986 (S.D.N.Y. 1980) ("'Substantial similarity' is to be determined by the 'ordinary observer' test.").

Indeed, the parties agree that comparison of the works is sufficient for the Court to determine striking similarity. Defendants' summary judgment brief, in its Preliminary Statement, contends that "[t]his Court will perceive the total lack of substantial similarity between the works upon viewing *The Truman Show* movie and reading *The Crew* script." (Dkt. No. 54: Defs. S.J. Br. at 1.) Mowry agrees that the Court should decide the summary judgment motion by comparing Mowry's and defendants' works:

> Niccol used Mowry's screenplay as the springboard to his most successful screenplay. <u>This will be apparent to this Court once it reads through the remarkable and sometimes identical duplications of expression of ideas that exist</u>, including certain blatant duplications that exist in *<u>The Truman Show</u>* drafts and handwritten notes produced to the plaintiff during discovery. This Court will also see that nearly every single element that eventually made it to the screen was originally conceived by Mowry and evolved through years of script revisions in an attempt by Niccol to remove all evidence of any connection to *The Crew*.

(Dkt. No. 76: Mowry S.J. Opp. Br. at 2, emphasis added.)

The Court has accepted the parties' invitation and has read Mowry's copyrighted draft of *The Crew* (Dkt. No. 69: Mowry Aff. Ex. A), the "Pleshette" version of Niccol's *The Truman Show* screenplay (e.g., Dkt. No. 33: DeNeve 11/23/04 Aff. Ex. 5), and watched the finished version (DVD) of *The Truman Show*.[15]

---

[15] The Court notes that the case law often refers to striking similarity as requiring even more than substantial similarity. <u>See</u>, <u>e.g.</u>, <u>Russ Berrie & Co.</u> v. <u>Jerry Elsner Co.</u>, 482 F. Supp. at 986 ("Having taken on the burden of showing Striking similarity, plaintiff in my view fails (continued...)

While the idea of a television program based on secret recording of a person's life is common to both works, they are not "strikingly similar." They differ in plot, theme, character, mood, setting, and total concept and feel.[16/] Judge Ward's conclusion in Cox v. Abrams is equally applicable here:

> Based on a comparison of the manuscript of [plaintiffs'] "Breaking the Tape" and a videotape of [defendant's movie] "Regarding Henry," this Court agrees with defendants that a reasonable reader/viewer could not find the two works sufficiently similar to raise an inference of copying. . . .
>
> . . . .
>
> Despite plaintiffs' arguments to the contrary, this Court cannot find that "Breaking the Tape" and "Regarding Henry" are so nearly alike as to preclude the possibility of independent creation. In the absence of any proof of access, the two works thus lack the necessary level of similarity to create an inference of copying.

---

[15/] (...continued)
to establish even Substantial similarity.") That certainly is true where the first and final versions of the defendant's work is virtually the same. That is not the case where the unpublished first (and/or early) drafts are examined for striking similarity for purposes of inferring access, while only the final public version is reviewed for substantial similarity purposes to show infringement. (Moreover, it is not uncommon for a plaintiff, as Mowry here, to claim that differences in the final version were caused by the defendant trying to hide his copying – which often sounds like a heads plaintiff wins, tails defendant loses argument, i.e., any similarity shows copying and any difference is to disguise the alleged copying.) Nevertheless, it remains true that the test for striking similarity is "stringent" and more so than substantial similarity. See, e.g., Jorgensen v. Careers BMG Music Publ'g, 2002 WL 1492123 at *5; Tisi v. Patrick, 97 F. Supp. 2d at 548.

[16/] Those differences are discussed in Defs. S.J. Br. at 15-30, in the context of substantial as opposed to striking similarity. The Court essentially agrees with defendants' analysis. It would neither advance the state of the law, nor make appellate review easier, for the Court to expand at length on this issue – appellate review (if plaintiff appeals) likely would be based on the panel's own review of *The Crew* and *The Truman Show*.

Because plaintiffs cannot make the threshold showing of copying by direct or indirect evidence, their copyright infringement claim must be dismissed.

Cox v. Abrams, 1997 WL 251532 at *6-7; see also, e.g., Seals-McClellan v. Dreamworks, Inc., 120 Fed. Appx. at 4 (summary judgment for defendants affirmed where Court's "review of the works" finds no striking, or substantial, similarity); Ferguson v. National Broad. Co., 584 F.2d at 114 ("In this case we find that the defendant properly supported its motion for summary judgment. It showed that there was no genuine issue of fact on either access or striking similarity. The plaintiff offered no probative evidence in rebuttal." Grant of summary judgment for defendant upheld.); Jorgensen v. Careers BMG Music Publ'g, 2002 WL 1492123 at *5 (summary judgment for defendants on no striking similarity where plaintiff's expert only opined that the songs were substantially similar but not strikingly similar); Tisi v. Patrick, 97 F. Supp. 2d at 548-49 (Court finds that "the two songs are not strikingly similar as a matter of law," there are numerous distinguishable elements in the two songs, and that "'[a]lthough plaintiff's expert opines that the songs are strikingly similar, an issue of fact cannot be created by merely reciting the magic words "strikingly similar" and "no possibility of independent creation"'"); Dan River, Inc. v. Sanders Sale Enters., Inc., 97 F. Supp. 2d at 430 (court's examination of designs finds two of defendant's designs to be strikingly similar, indeed "virtually identical," to plaintiff's but that differences in design on third work makes it not strikingly similar); Dimmie v. Carey, 88 F. Supp. 2d at 150 (summary judgment for defendants where plaintiff's own expert found similarities in the two songs but he "does not use the phrase 'striking similarity.' Nor does he state that [defendant's song] could not have been independently created."); McRae v. Smith, 968 F. Supp. 559, 567 (D. Colo. 1997), (court listened to the two songs and, despite expert's report,

granted summary judgment for defendants on lack of striking similarity); <u>Prince Group, Inc.</u> v. <u>MTS Prods.</u>, 967 F. Supp. 121, 126 (S.D.N.Y. 1997) (Although substantially similar, "[t]he allegedly infringing design of the 'Stars and Clouds' design is not strikingly similar to the copyrighted design due to the darker shade of the predominant colors in the infringing design.); <u>American Direct Mktg., Inc</u>. v. <u>Azad Int'l, Inc.</u>, 783 F. Supp. at 95 ("Striking similarity exists when two works are 'so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later . . . was copied from the first.' . . . The issue of copying, therefore, rests on the similarities which are judged according to the perception of an 'ordinary observer' or an 'average lay observer.' Having viewed the commercials at issue, I do not consider them strikingly similar, although similarities exist.") (citations omitted); <u>Russ Berrie & Co.</u> v. <u>Jerry Elsner Co.</u>, 482 F. Supp. at 986 ("I concede that the Santas are not substantially similar; A fortiori they are not so strikingly similar as to preclude the inference that both parties arrived independently at the same result.").

In short, based on the Court's review of *The Crew* and the draft and final version of *The Truman Show*, the Court holds that no rational jury could find the two works to be strikingly similar. <u>See</u>, <u>e.g.</u>, <u>McRae</u> v. <u>Smith</u>, 968 F. Supp. at 567-68 ("In this case, as in <u>Ferguson</u>, there is insufficient evidence that could, if believed by the jury, establish such striking similarity that access could be inferred in the absence of any actual evidence of access."); <u>Cox</u> v. <u>Abrams</u>, 1997 WL 251532 at *4 (S.D.N.Y. May 14, 1997) ("Unless a reasonable jury could find striking similarity between 'Breaking the Tape' and 'Regarding Henry,' summary judgment based on lack of access is proper." Finding no striking similarity, Court grants summary judgment to defendants).

**A.**     <u>Dr. Chaski's Testimony Does Not Change The Result</u>

Mowry contends that "[w]hile the similarities in Niccol's original drafts and notes of *The Truman Show* should be enough to satisfy this Court that an issue of fact exists on the question of access, plaintiff also submits the expert report and affidavit of Dr. Carole Chaski . . . who, after applying the five-step cladistic, or phylogenetic tree, method used to determine derivative authorship, opined that the specific language and expressions used by *The Truman Show* exhibited such similitude within certain illustrative properties that it is impossible that *The Truman Show* was created without defendants having seen, and been influenced by, plaintiff's screenplay." (Dkt. No. 76: Mowry S.J. Opp. Br. at 2-3.)

Mowry attempts to prove that defendants had access to *The Crew* by using Dr. Chaski's "cladistic (or phylogenetic tree) method for detecting the ancesral properties of derived authorship" from *The Crew* to two versions of *The Truman Show*:

> Dr. Chaski's report and testimony is proferred to demonstrate that the analyzed drafts of *The Truman Show* analyzed are ancestrally related to *The Crew* and, thus, derive their authorship from plaintiff's screenplay and were not created independently. This clearly falls within the scope of indirect evidence permitted by the courts when determining the question of access to the plaintiff's work and the jury must be allowed to weigh this evidence when determining whether the author of *The Truman Show* had been influence[d] by *The Crew* when he created *The Truman Show*.

(Dkt. No. 47: Mowry Chaski Opp. Br. at 2, 19-20; <u>see also</u> <u>id</u>. at 1-2.)

For several reasons, Dr. Chaski's report and testimony is not sufficient to change the Court's conclusion that *The Crew* and *The Truman Show* are not strikingly similar.

First, Mowry points to no case in which an expert using cladistic or phylogenetic tree analysis has been used to show striking similarity (or even substantial similarity) between literary works, and the Court's research has found no such cases.  While it is true that there must be a first time for an expert methodology to be accepted by the courts, this is not the case.[17]  See, e.g., In re Perry County Foods, Inc., 313 B.R. 875, 909 (Bankr. N.D. Ala.2004) ("Just because a methodology is being used for the first time is the reason for exclusion standing without either (i) other support, such as empirical unsoundness or (ii) a legally accepted policy based premise for excluding evidence even when it is an empirically sound, non-universal generalization, should not always be used as barring it from being admissible evidence. For under the generalization of 'first time usage,' such a rule would exclude evidence which may be tested to show that it is empirically or otherwise sound, that is reliable and legally relevant to the issues at hand. However here, testing proves the opposite and supports application of the Daubert-Kumho guidance that it should be excluded when not known by other experts, not having been the subject of peer review, and not having gained acceptance in the specialized knowledge community.") (citations & fn. omitted).

Second, Rule 702 requires that the "specialized knowledge" of the expert must be such as to "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  The Court has read *The Crew* and read and viewed versions of *The Truman Show*. Unlike in specialized areas like music, the trier of fact can compare the works without the need of

---

[17]    Indeed, a Westlaw search of all federal cases for the terms "cladistic" and "phylogenetic tree" yielded not a single copyright or any other case where an expert used such methodology.

expert assistance. (See page 21 above.) Indeed, Dr. Chaski's cladistic analysis is more confusing than helpful. See, e.g., Page v. Barko Hydraulics, 673 F.2d 134, 139 (5th Cir. 1982) (Upholding trial court's exclusion of expert testimony that "could have been more confusing than helpful."). And her numerical HCA analysis is dependent, in part, on similarities and differences between the two different *The Truman Show* scripts that she compared to *The Crew* – had different *Truman* drafts been used instead of or in addition to the two she used, the HCA clustering analysis would have been different. (See Chaski Dep. at 87-88, 155-56.)

Third, a major defect in Dr. Chaski's report is that her comparisons were not based on the screenplays themselves but on her charts, in which she summarized or paraphrased aspects of *The Crew* and *The Truman Show*. (See Dkt. No. 43: Defs. Chaski Exclusion Br. at 7, 9; see also, e.g., Dkt. No. 33: Chaski Dep. at 100-05, 140-41, 149, 152-53.) Dr. Chaski's intermediate step of preparing summaries of *The Crew* and *The Truman Show* and then comparing her summaries create subjective distortions – how she summarized *The Crew* and *The Truman Show* could, and did, seriously affect her later comparisons. At her deposition, Dr. Chaski agreed that a particular item's coding "could have gone either way," and in another instance, could not tell if her summary was mistaken and the she "would have to check the data," i.e., *The Truman Show* script. (Chaski Dep. at 131, 133.) Moreover, Dr. Chaski did not test to see if any of the allegedly common schemata she found are scenes a faire (a term she was unfamiliar with) or common across a multitude of scripts, i.e., the prior art referred to by defendants. (See Defs. Chaski Exclusion Br. at 7-8; Dkt. No. 54: Defs. S.J. Br. at 16; Chaski Dep. at 20, 141-42, 157-62.) Dr. Chaski has conceded that her five part

method for determining plagiarism has not been subject to peer review nor otherwise tested, and because of the subjective method she used to code similarities, may not be reproducible. (See Defs. Chaski Exclusion Br. at 13-14; see also Chaski Dep. at 61-67, 75-76, 82.)  Indeed, in scientific summarizations, independent "coders" usually are used but were not used here. (Chaski Dep. at 105-07, 113, 128-29, 131, 133, 135, 150-53.)  While Mowry claims that all of this goes to the weight and not the admissibility of an expert's testimony (Dkt. No. 47: Mowry Chaski Opp. Br. at 17), in this case, the subjectiveness of comparing self-created summarizations of literary works that the trier of fact is able to read/view, creates too great a risk of jury confusion.

Fourth, while Dr. Chaski argues that as a result of similarities, *The Truman Show* was derived from *The Crew*, the Court cannot say that Dr. Chaski's testimony is sufficient to show that *The Truman Show* could not possibly have been the result of independent creation, which is the appropriate test for striking similarity.  (See cases cited at pages 19-20 above.)

Finally, the Court concludes that Dr. Chaski's expert report does not create an issue of fact precluding summary judgment.  An expert cannot create an issue of fact by rendering an opinion on similarity as to works that no rational jury could find to be strikingly similar.  See, e.g., Onofrio v. Reznor, No. 99-55223, 208 F.3d 222 (table), 2000 WL 206576 at *1 (9th Cir. Feb. 23, 2000) ("Without any showing of access, Onofrio can only prevail by establishing that Reznor's songs are 'strikingly similar' to the protected elements in his songs.  Onofrio relies on the testimony of his expert, Dr. Erica Muhl, to show such similarity. Although Dr. Muhl uses the appropriate legal phrases throughout her report comparing the songs of Onofrio and Reznor, her conclusions are not

supported with fact or analysis. Her report identifies and lists several unprotectable musical elements that she found in both Onofrio's songs and the comparable songs by Reznor, but she fails to explain how the arrangement or combination of those unprotected elements in Onofrio's songs created an original, protectable expression which was then copied by Reznor. Thus, the district court did not err in finding that Onofrio failed to raise a material issue of disputed fact concerning the similarity of the songs.") (citations omitted); Jorgensen v. Careers BMG Music Publ'g, 2002 WL 1492123 at *5 (summary judgment for defendants on no striking similarity where plaintiff's expert only opined that the songs were substantially similar but not strikingly similar); Tisi v. Patrick, 97 F. Supp. 2d at 548-49 ("'[a]lthough plaintiff's expert opines that the songs are strikingly similar, an issue of fact cannot be created by merely reciting the magic words "strikingly similar" and "no possibility of independent creation."'"); McRae v. Smith, 968 F. Supp. at 567 (court listened to the two songs and, despite expert's report, granted summary judgment for defendants on lack of striking similarity).

For these reasons, to the extent that Dr. Chaski's report is submitted to prove that defendants had access to *The Crew*, defendants motion to exclude Dr. Chaski's expert testimony is GRANTED.

## **CONCLUSION**

For the reasons discussed above, defendants' motion to exclude Dr. Chaski's expert report and testimony is GRANTED, and the Court grants summary judgment to defendants because

of the absence of proof of access (or striking similarity). All other pending motions are deemed moot.

The Clerk of Court is to enter judgment dismissing plaintiff Mowry's complaint.

SO ORDERED.

Dated:     New York, New York
             July 29, 2005

**Andrew J. Peck**
United States Chief Magistrate Judge

Copies to:    Alan A. Heller, Esq.
           Jonathan Zavin, Esq.
           Alexandra N. DeNeve, Esq.